DOUGHBOY INDUSTRIES, INC. v. TURKWOOD, INC.
FARIBO TURKEYS, INC., GARNISHEE.
PRODUCTION CREDIT ASSOCIATION OF
RIVER FALLS, WISCONSIN, INTERVENOR.

160 N. W. (2d) 713.

August 2, 1968—No. 40,820.

*Oppenheimer, Hodgson, Brown, Wolff & Leach, John D. Healy, Jr.,* and *Casey A. Underhill,* for appellant.

*McMenomy, Hertogs & Fluegel, Donald J. Fluegel,* and *Fred Burstein,* for respondent intervenor.

Heard before Knutson, C. J., and Nelson, Sheran, Peterson, and Frank T. Gallagher, JJ.

SHERAN, JUSTICE.

Plaintiff, hereinafter called Doughboy, brought this action in the District Court of Olmsted County on a Wisconsin judgment held by it against Turkwood, Inc., hereinafter called Turkwood, and served garnishment process upon Faribo Turkeys, Inc., a Minnesota cooperative, hereinafter called Faribo, in an effort to reach certain "patronage equities" payable because Faribo processed turkeys mortgaged by Turkwood to Doughboy. The Production Credit Association of River Falls, Wisconsin, a United States corporation, hereinafter called P. C. A., intervened claiming that it was entitled to the "patronage equities" by virtue of an assignment thereof taken by it on January 31, 1962. Issue was joined between Doughboy and P. C. A. by an answer to the complaint in intervention which alleged that the assignment was not effectual as against Doughboy. Trial of this issue by the court resulted in a decision in favor of P. C. A., and this appeal followed.

Doughboy's rights to the "patronage equities" involved depend on a chattel mortgage dated March 28, 1961, and duly filed, whereby Turkwood "for the purpose of securing the payment of any indebtedness now owed and such further and future debts as may hereafter be incurred" mortgaged to Doughboy a flock of turkeys and turkey poults then owned by Turkwood.

The mortgage provides that Turkwood was "not to sell, convey or encumber said turkeys or turkey poults * * * and not to remove or permit any of said property to be removed from the premises above described, without the prior written consent of the Mortgagee * * *, it being understood that the proceeds of any sale of the mortgaged property shall be

paid jointly to Mortgagor and Mortgagee, and *Mortgagor is not to share in any of the proceeds until the total amount of the indebtedness owing to Mortgagee is first satisfied."* (Italics supplied.)

If the chattel mortgage gives Doughboy the right to the "patronage equities" now in dispute, Doughboy's claim to these equities (the debt secured being unpaid) is superior to that of P. C. A. because the chattel mortgage precedes the assignment to P. C. A. in point of time. If the "patronage equities" are not Doughboy's by virtue of the chattel mortgage, the assignment by Turkwood to P. C. A., even though made after the chattel mortgage became operative, would have been effectual to transfer Turkwood's interest to P. C. A., subject to the limitations restricting creditor preferences.

The trial court found that the "patronage equities" were not a part of the "proceeds of the sale" of the turkeys within the meaning of the phrase as used in the mortgage and concluded that P. C. A. became owner of these equities by virtue of its assignment.

The "patronage equities" in dispute and held by Faribo exist because Faribo is a cooperative organization of which Turkwood became a member by acquiring one share of stock. The cooperative does not buy turkeys; it prepares them for market. Turkeys consigned to it by members are processed for 7½ cents per pound. The processed turkeys are sold by Faribo or held by it in storage for future sale as directed by the owner. When turkeys are sold upon being processed, the cooperative transmits the proceeds of the sale, less 7½ cents per pound, to the persons entitled to such proceeds. When processed turkeys are held by the cooperative and sold later upon direction of the owner, Faribo makes advancements to the owner, final settlement being reached when the turkeys are marketed. If the money so advanced should exceed the net sale proceeds, the member patron is obligated for the difference. "Patronage equities" are fixed at the close of the cooperative's fiscal year. When a profit accrues to the cooperative from its operations for the accounting period, its board of directors sets the amount of such profits to be assigned to an account termed the "equity reserve account." Funds in this account in excess of an amount deemed by the board of directors to be adequate to meet possible future losses become the "patronage equities" available for dis-

tribution to the member patrons and payable to each in the proportion which the quantity of turkeys processed and sold by him through the cooperative bears to the total quantity of turkeys so processed and sold by the cooperative for the accounting period.

Although Turkwood was authorized by Doughboy to have the mortgaged turkeys processed at Faribo or other places, and although the 7½-cents-per-pound processing charge made by the cooperative was no higher than that customarily charged by other authorized processors not operating on the cooperative principle, the patronage equities distributed at the end of the fiscal years here involved represent, in our opinion, what is (in effect and as between the parties here involved) a rebate to which Turkwood became entitled only because it had processed and marketed the mortgaged turkeys through the cooperative. Viewed in this light, the patronage equities were a part of the "net proceeds" of the sale of the turkeys. Furthermore, by the terms of the chattel mortgage and so long as the indebtedness secured remained unpaid, Turkwood, in arranging for the processing and sale of the turkeys, was obligated to recognize the interests of Doughboy. Doughboy was, in our opinion, as much entitled to the patronage equities, the distribution of which was deferred, as it was to the sale price of the turkeys minus the processing charge of 7½ cents per pound which it received. To hold otherwise would be to permit the mortgagor to profit from the sale of mortgaged property at the expense of the mortgagee.

The patronage equities are not described specifically in the chattel mortgage as being property subject to the mortgage. Nevertheless, we have concluded that the equities are "proceeds of the sale" [1] of the turkeys within the meaning of the quoted provision of the chattel mortgage contract. In addition, the "patronage equities" are a benefit accruing because of the designation of the cooperative to act as a processor and consignee for the purpose of selling the mortgaged turkeys.[2] The mort-

---

[1] For other definitions of the words "proceeds of sale," see 34 Wd. & Phr. (Perm. ed.) p. 222. See, also, Phelps v. Harris, 101 U. S. 370, 25 L. ed. 855; Wheeler & Wilson Mfg. Co. v. Winnett, 3 Neb. 293, 91 N. W. 514.

[2] For a discussion of the essential characteristics of a member-patron's interest in the "proceeds" of cooperatives, see Note, 35 Minn. L. Rev. 549, 552;

gagor was acting for Doughboy as well as itself when it selected the cooperative as the processing and selling agent. The right to the benefit resulting, in our opinion, became the property of the mortgagee until the secured debt was paid.[3]

Although this appeal presents a question without precedent in either Wisconsin or Minnesota,[4] we believe that on balance the claims of the mortgagee to these equities is superior to that of the mortgagor.

Reversed and remanded to the district court for further proceedings consistent with this opinion.

Clark & Warlich, *Taxation of Co-operatives: A Problem Solved?*, 47 Minn. L. Rev. 998; 20 M. S. A. 650, Note 5.

[3] Cf. Bannon v. Bowler, 34 Minn. 416, 26 N. W. 237; National Citizens' Bank v. Ertz, 83 Minn. 12, 85 N. W. 821, 53 L. R. A. 174; Pederson v. Johnson, 169 Wis. 320, 172 N. W. 723; Middleton Lbr. & Fuel Co. v. Kosanke, 216 Wis. 90, 256 N. W. 633.

[4] In Baird v. Gleason (8 Cir.) 53 F. (2d) 785, 786, a mortgagee who received an advance made by a cooperative to the mortgagor as a patron-member was required to return to the cooperative so much of this advance as proved to be excessive because "the mortgagee was, as to the association * * * exactly in the shoes of the mortgagor member. Its rights were no greater and no less."